Filed 10/25/23  In re L.M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re L.M. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>S.A.,<br><br>    Defendant and Appellant. | G062537<br><br>(Super. Ct. Nos. 23DP0246, 23DP0247, 23DP0248)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Vibhav Mittal, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearances for the Minors.

S.A. (Mother) appeals from the juvenile court's jurisdictional and dispositional orders declaring her three children, L.M. (13 years old), A.M. (12 years old), and D.A. (8 years old), dependents of the court. The children were taken into protective custody after the Orange County Social Services Agency (the Agency) investigated a report Mother's home was unsanitary and hazardous because of trash and clutter. The court found the three children came within its jurisdiction under Welfare and Institutions Code section 300, subdivision (b)(1).[1] Mother contends the court's jurisdictional findings must be reversed as there was insufficient evidence of a substantial risk to the children because the home had been cleaned by the time of the hearing. We conclude the court's findings were supported by substantial evidence, and we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On February 23, 2023, the Agency received a report concerning the condition of the home where Mother and her children reside.[2] They live in a duplex-style home, which they share with 13 family members, including the children's maternal grandparents. Mother and her three children sleep in the living room. L.M. and A.M. sleep in bunk beds, while D.A. sleeps in Mother's bed. It was reported the home was in an unsanitary condition with trash throughout the living room area and underneath the beds, and the home smelled of animal urine. The reporting party stated the living room contained tall stacks of boxes with lawn chairs on top of the boxes.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Mother has full custody of the children. M.M. is the father of L.M. and A.M., and C.B. is the alleged father of D.A. Neither father has had contact with the children in several years, and the Agency was unable to locate C.B. during the proceedings below. As neither father appealed from the court's orders, we limit our references to them.

The Agency investigated. On February 28, 2023, a social worker spoke to L.M. and D.A. at school.[3] Both girls appeared clean and well-groomed and were wearing clean clothing. They indicated they had enough food to eat and clean clothes to wear and were receiving regular medical and dental care. L.M. said she had lived in the home her entire life and described it as "'nice.'" She acknowledged the home could get messy but said everyone did their part to keep it clean. The girls explained the boxes and bins in the living room contained the family's clothes. Both girls stated they felt safe and protected at home. They denied the home smelled of animal urine and denied having concerns about the home's condition.

On March 1, 2023, the social worker conducted an unannounced visit at the home and interviewed Mother, who was cooperative. The home's entryway had boxes and other items stacked along the walls. The living room contained a bunkbed and a bed but lacked a separate seating or dining area. One of the home's bedrooms had a three feet tall stack of clothes, from which the children reportedly would pull clean clothes to wear. A stack of dirty clothes was observed along the walls. Mold covered a substantial portion of the bathroom ceiling. The kitchen was filthy. The kitchen cabinets were dirty and rotting, and there were two filthy refrigerators containing food items. The hallway had a narrow passageway due to items being stored on either side.[4]

When questioned about the home's condition, Mother attributed some of it to the landlord's failure to maintain the home and make necessary repairs. She also explained the maternal great-grandmother was a hoarder. After the maternal great-grandmother passed away, the family was deeply affected by the loss and in its depressive state did not have the energy to clean the home. Mother explained the

---

[3] A.M., who is autistic, was unable to answer the social worker's questions.

[4] Photographs were taken of portions of the entryway, the living room, a bedroom, the hallway, and the bathroom. We have reviewed the photographs included in the appellate record.

3

containers against the wall and in the living room contained her and the children's belongings. She denied the home smelled of animal urine but indicated the maternal grandmother had two caged birds. Regarding the trash in the living room, she stated the children sometimes eat their food and leave their trash behind.

Mother reported the children receive routine medical and dental care and have medical insurance. She stated all three children have been diagnosed with autism, ranging from high functioning to severe, but none of the children were receiving therapy or taking medication.

The social worker spoke to staff at L.M. and D.A.'s school, who relayed concerns about the girls' excessive absences and performance in school. Both girls were failing classes and/or behind in school. One school official explained Mother had been called before the School Attendance Review Board (SARB) because of the girls' school absences. (A.M. was bussed to school, and his attendance was good.)

The Agency had previously received reports about D.A. and L.M.'s absences from school. In April 2022, D.A. reportedly had 26 excused and 22 unexcused absences for that school year. Mother told the school D.A. had allergies, so the school suggested Mother obtain allergy medication for the child. D.A.'s attendance did not improve. Mother frequently reported the children were sick and unable to attend school. After meeting with Mother about the absences, the school directed her to bring the child to school so a nurse could confirm the child was too sick to attend or bring a doctor's note to excuse the child from school. By May 2, 2022, D.A. reportedly had around 70 absences for the school year. On that date, Mother contacted the school to report D.A. had hurt herself on a trampoline, was sore, and would not be attending school.

Mother indicated the girls' school was within walking distance of their home. But Mother did not allow them to walk to school by themselves, and she did not walk them to school because she was scared to do so. The maternal grandmother drove

4

the girls to school instead.  Mother stated L.M. did not want to attend school and had a screening scheduled for therapy.

Mother also told the school L.M. was diagnosed as autistic but Mother had not provided any documentation concerning the diagnosis.  Mother requested the school test D.A. for autism or a learning disability, but the school was unable to do so because of the child's excessive absences.  Mother had reportedly disenrolled D.A. from two prior schools within the past calendar year after the administrators at those schools refused to diagnose D.A. with a disability.

The Agency concluded the home presented a threat to the children's safety and well-being.  The social worker and Mother developed a safety plan, in which Mother agreed to organize and clean the living area and maintain a safe living environment for the children.  A follow-up appointment was scheduled.

However, the following day, after internal discussions at the Agency, the Agency decided to obtain a protective custody warrant removing the children from Mother's custody.  On March 3, 2023, at the Agency's request, the juvenile court issued a protective custody warrant for all three children, based on evidence of general neglect, as the home's unsanitary and hazardous conditions placed the children at risk of possible injury or illness.  The children were removed from Mother's custody and placed with their maternal great aunt and uncle.

I.

CHILD WELFARE PETITION

On March 7, 2023, the Agency filed a child welfare petition, alleging the three children came within the jurisdiction of the court under section 300, subdivision (b)(1).  The petition alleged there was a substantial risk the children would suffer serious physical harm or illness:  (1) as a result of the failure or inability of the parent to supervise or protect the children adequately; and/or (2) by the willful or negligent failure of the parent to provide the children with adequate shelter or medical treatment.  The first

5

factual allegation in the petition stated Mother failed to ensure the children had a safe and sanitary home environment and described the unsanitary and hazardous conditions of the home observed by the social worker on March 1, 2023. The petition's second factual allegation stated Mother failed to ensure L.M. and D.A. regularly attended school or received necessary services. This factual allegation asserted Mother had stated all three children are autistic but none of them are receiving therapy.

## II.

### DETENTION REPORT AND HEARING

At the detention hearing on March 8, 2023, the court received into evidence a report prepared by the Agency. The report discussed why the children were removed from Mother's custody and expressed the Agency's concern Mother would continue to provide an unsanitary and hazardous home environment, which might result in injury or illness to the children. The report indicated a social worker had spoken to Mother, who stated the family had made good progress on cleaning the home. The mold on the bathroom ceiling had been removed and the ceiling had been treated with chemicals.

At the detention hearing, the court found the Agency had made a prima facie showing the continued detention of the children was necessary. (§ 319.) The court found there was a substantial danger to the physical and emotional health of the children and living in Mother's home was contrary to their welfare. However, the court authorized the Agency to return the children to Mother once she remedied the home's health and safety issues.

## III.

### JURISDICTION AND DISPOSITION REPORT AND HEARING

A contested jurisdiction and disposition hearing was held on multiple dates in March and April 2023. At the hearing, the court received the Agency's jurisdiction/disposition report into evidence without objection. In its report, the Agency

6

recommended the court sustain the petition as to all three children, declare them dependents, and provide family maintenance services to Mother.

At the time the Agency's report was prepared, the children remained placed with their maternal great aunt and uncle. However, the children were returned to Mother just days before the jurisdiction/disposition hearing on March 29, 2023. Although the children were returned to Mother, the Agency still had concerns about Mother's ability to maintain the home in a clean and safe condition and her ability to supervise the children by making sure they consistently attended school.

The Agency's report contained Mother's statements concerning the petition's allegations regarding the home's condition. Mother stated the home began getting cluttered about a year and a half ago. She explained most of the clutter in the home belonged to the maternal great-grandmother, who was a hoarder. After the maternal great-grandmother passed away unexpectedly in 2020, the family had a difficult time. Mother stated the family was grieving the loss and found it difficult to go through her things and discard them. Mother also cited the landlord's failure to make repairs to the home as a reason why it was in the state it was when the children were removed. Mother denied the home smelled of animal urine.

The maternal great aunt reported the family home had been cluttered for a while. She stated the home's poor condition had worsened after the maternal great-grandmother passed away.

On March 13, 2023, a social worker conducted an in-person meeting with Mother at her residence. Mother showed the social worker the area of the home she occupies. There was new flooring in the living room. There was a large bed, which Mother reported was hers, and she requested additional beds for the children. The bathroom was clean and free of clutter. The bathroom ceiling and walls were clean and had been recently painted. Mother identified a tile missing from the bathroom shower and a broken window but indicated these items were going to be fixed. Mother pointed

7

out a new refrigerator in the dining room, but the social worker was unable to access it because of furniture and other items in the way. Mother stated the dining room would be clean and organized the next time the social worker visited.

The Agency's report also contained information concerning the allegation Mother failed to ensure the children regularly attended school or received necessary services. As of March 8, 2023, L.M. had 34 excused and 34 unexcused absences for the school year and was failing six classes. D.A. had 49 excused and 11 unexcused absences for the school year.

Mother made statements addressing the allegation she failed to ensure the children regularly attended school or received necessary services. She explained L.M. and D.A. were often sick after they contracted COVID-19 in 2022. Mother stated all three children had been diagnosed with autism; L.M. was diagnosed at age eight, A.M. at age seven, and D.A. at age three. She did not have proof of L.M. or D.A.'s diagnosis. A.M. has a primary disability of intellectual disability and a secondary disability of autism; he has an individualized education program (IEP) at school. Mother stated the children do not have immune system issues.

The Agency's report indicated Mother had made moderate progress toward alleviating or mitigating the causes that necessitated the court's involvement. The report noted Mother and extended family members made efforts during a brief period to address the safety hazards in the home and had made substantial changes to make sure the home was safe so the children could return. The report further stated Mother appeared to now understand she must ensure the children consistently attend school.

In the case plan, the Agency stated it was concerned Mother would continue to provide a hazardous home environment, which may result in injury or illness to the children. The Agency asserted Mother would benefit from ongoing services to meet the children's needs, demonstrate she is able to maintain the home in a clean and safe condition, and ensure the children regularly attend school and their developmental

needs are met. Mother agreed to participate in the services recommended by the Agency, which included parenting education and individual counseling. Mother stated she would be more organized and would maintain a clean home.

At the hearing, social worker K.C. was cross-examined by the parties concerning the Agency's report. When she visited the home on March 15, 2023, the living room was uncluttered, there was no visible mold in the bathroom, and the home smelled nice.

Although the home was clean enough for the children to return, the Agency was concerned as to whether it would be maintained in a clean and safe condition. The social worker was concerned there may be more underlying causes for the condition of the home than grieving the loss of the maternal great-grandmother, and if those underlying reasons were left untreated, the house would degenerate into an unsafe condition. The social worker was concerned about Mother's decision-making because Mother exhibited poor judgment by allowing the children to live in the home in its previous condition. Part of the reason the social worker recommended the court sustain the petition was so the family could receive services to ensure the home does not return to its previous condition, which posed a risk to the children. The social worker believed Mother could benefit from participating in counseling and completing a parenting class. In counseling, Mother could address the root cause of why she permitted the children to live in deplorable conditions. Although Mother had signed referrals for services, she had not yet started the services.

The social worker testified there were also concerns about Mother's ability to meet the children's needs because L.M. and D.A. had missed significant amounts of school, absences Mother explained were due to the children getting sick a lot. The social worker found Mother's explanation questionable, given the number of school days the children had missed. The social worker was unsure if the condition of the home caused the children's illnesses, but it was possible.

9

The children's maternal grandfather testified at the hearing. He lived in the home with Mother and the children, and half of the clutter in the living room was his. A few months before the children were detained, the ventilation fan in the bathroom stopped working; he believed this resulted in the mold in the bathroom. He replaced the fan months ago. When he replaced the bathroom fan, Mother asked him for help cleaning the mold, but he did not do anything about the mold at that time.

After the children were removed, the maternal grandfather and another family member, who is a construction worker, remediated the mold on the bathroom's walls and ceiling. They cleaned the bathroom using bleach and another chemical, applied a paste on the ceiling, and painted using paint recommended for preventing mold. They did not have a licensed professional determine the source of the mold. Nor did they check inside the bathroom vent or within the walls to determine if there was mold residing in these spaces.

Mother also testified at the hearing, discussing the condition of the home when the children were removed. Mother explained she started becoming concerned about the home's condition about a year earlier and thought it might be dangerous for the children. She talked to the maternal grandfather about the home's condition because most of the clutter belonged to the maternal grandparents and the maternal great-grandmother. Mother stated she tried to clean but did not have space to put away items. She was unable to find another place to live with the children. Mother testified she now understands how dangerous the home was for the children because of the clutter everywhere. Mother said she did not cook and therefore the dirty kitchen was not her fault.

Mother noticed the mold in the bathroom a few months earlier, after the bathroom ventilation fan stopped working. Prior to the court's intervention, Mother did not know exposure to mold could cause illness. After learning this, she made an

appointment with the children's doctor for blood work to be performed. The results were pending at the time of the hearing.

Mother testified L.M. and D.A. missed a lot of school because they were frequently sick. She gave various and sometimes inconsistent answers as to why the girls were often ill. Mother explained the girls had COVID-19 in January 2022, and since then, she has noticed their immune systems are weaker. She stated the girls would catch the flu or a cold at school. But she also testified the girls' absences were mostly for allergies.

In her testimony, Mother also discussed the allegation she failed to ensure the children regularly attended school or received necessary services. She stated A.M. was diagnosed with cognitive delay when he was four years old and autism when he was six. He has had an IEP at school since he was four years old. For a time, he received applied behavior analysis (ABA) therapy at home but had not received any for a year prior to the hearing. Mother had discontinued the services of ABA therapy providers in the past because she was unhappy with their service. But A.M. was now on the wait list for a different ABA therapy provider. Mother never informed A.M.'s school he was not receiving ABA therapy at home.

When D.A. was three years old, a psychologist diagnosed her with moderate autism and recommended ABA services and special education school. D.A. received ABA therapy for two months, but Mother cancelled it because of scheduling issues. D.A. had not received ABA therapy in the past five years. D.A. did not attend preschool; she started school when she was five years old. Mother told the school D.A. had been diagnosed with moderate autism, but the school did not recommend any services for her. D.A.'s school had not indicated there were concerns about her psychological well-being or that she needed an IEP assessment. D.A. was ahead in her schoolwork. Despite the numerous absences, D.A. was not falling behind in school, but L.M. was.

11

Mother testified a psychologist diagnosed L.M. with high-functioning autism when she was younger and the psychologist stated L.M. needed an IEP and ABA services. L.M. has never received ABA therapy. When L.M. was in second grade, Mother asked the school to do an IEP assessment. Mother testified both that the school did not assess L.M. for an IEP and that the school "kind of" assessed her and determined she did not qualify. Mother never formally requested an IEP assessment for L.M. because she believed the school would just decide she did not need it. Mother testified L.M.'s poor performance in school was not the result of her autism but because she did not want to do her homework. When the school expressed it was concerned about L.M.'s anxiety, Mother worked with the school to get L.M. therapy.

Mother understood her case plan included counseling and parenting classes. While Mother believed these would be helpful, she did not believe she needed them. She had previously taken a parenting class and did not think she needed to take it again. She did not think she needed counseling, but if she did, she could obtain it herself.

The court sustained the petition, as amended, declared the children dependents of the court, but allowed them to remain at home in Mother's custody. Explaining its ruling, the court stated: "There were statements that mother seemed to blame the landlord for the condition of the home, but the landlord was not responsible for all the items that were in the home, which was one of the primary reasons the court sees risk in the case. The court reviewed the photos from March 1st, 2023. It's about six weeks from today, and the court did see a home that could cause, quite easily, serious and physical harm or illness to any of the three minors. [¶] Even if the death of the maternal great Grandmother was . . . kind of the source or origin of why there was clutter in the home, it doesn't appear mother has received mental health treatment to address the loss or any other reason that the home was in that unsafe state." The court noted the maternal great-grandmother had died a few years earlier and Mother had not obtained counseling on her own. The court, therefore, did not believe Mother would seek treatment on her

12

own, and the court's involvement was necessary. The court found the mold in the home demonstrated there was a substantial risk to the children as required under section 300, subdivision (b)(1). The court further stated: "The lack of schooling and A.[B].A. therapy is relevant in the sense that it shows some of the concerns that the court has. It doesn't directly, obviously, put the minors at risk for serious physical harm or illness, but I think its background is relevant to some of the concerns that the Court does believe need to be mitigated by the court's involvement."

The court commended the family for quickly cleaning the home once the children were removed but noted the home had been clean for only a short period. The court stated it was "convinced that without some involvement with the court and the agency, the home would likely return to its prior state putting the minors at risk of . . . serious physical harm or illness." The court indicated it considered whether to dismiss the petition or an alternative where Mother was voluntarily offered services, but the court concluded its involvement was necessary.

The court ordered the Agency to check on the home's condition once per month; speak to the children's teachers regarding their progress in school; provide referrals to Mother that can assist with cleaning the mold in the family's home; make counseling referrals for L.M. and D.A.; and provide Wraparound services if suitable. Mother was ordered to provide proof of enrollment in ABA therapy for the three children within 90 days, if they were deemed eligible; inform the social worker if the children miss school and provide proof to SARB; comply with SARB's requirements; and provide the lab results to the Agency concerning the children's blood tests for mold exposure.

Mother filed a timely notice of appeal.

DISCUSSION

Mother contends the juvenile court's jurisdictional findings are not supported by substantial evidence and must be reversed. We disagree.

13

# I.

## SECTION 300 AND THE STANDARD OF REVIEW

The juvenile court asserted jurisdiction over the children pursuant to section 300, subdivision (b)(1). A juvenile court may exercise jurisdiction under this section if the court finds by a preponderance of the evidence that, as relevant here, "there is a substantial risk that the child will suffer[] serious physical harm or illness[] as a result of . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" or as the result of "[t]he willful or negligent failure of the parent . . . to provide the child with adequate . . . shelter[] or medical treatment." (§ 300, subd. (b)(1)(A), (C); *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.'" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

"The juvenile court's jurisdictional and dispositional findings must be upheld if supported by substantial evidence." (*In re Ma. V.* (2021) 64 Cal.App.5th 11, 22.) "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely

14

determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'""'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) On appeal, the parent has the burden of showing the evidence was insufficient to support the court's order. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138.)

II.

THE COURT'S JURISDICTIONAL FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Mother contends the evidence was insufficient to support child welfare jurisdiction. She asserts the evidence at the time of the jurisdiction hearing established the children were no longer at risk because the home was clean and safe; the bathroom mold issue had been remedied; she understood the problems that can arise from a dirty home; and she was committed to maintaining the home in a safe condition. She also argues the children's absences from school were irrelevant to the issue of the court's jurisdiction and should not have been considered by the court.

The court's jurisdictional finding is supported by substantial evidence. Mother allowed the children to live in the home in its unsafe and unsanitary condition for at least two years. While the home had been cleaned by the time of the jurisdiction hearing, it had only been clean for a few weeks. The court was reasonably concerned not enough time had elapsed for Mother to demonstrate she could maintain the home in a clean and safe condition, especially considering how long it had been otherwise. Moreover, although the home was clean, the underlying issues that lead to the home being in an unsafe and unsanitary condition had not been addressed. Because Mother had not addressed the underlying causes in counseling and did not believe she needed counseling, it was reasonably likely the home would revert to the unsafe and unsanitary condition.

15

The court correctly concluded Mother would not seek counseling or treatment on her own and the court's involvement was therefore necessary. At the hearing, Mother seemed resistant to counseling. While she admitted it would be helpful, she stated more than once she did not need it. Thus, it was unlikely Mother would either obtain counseling or address the underlying issues on her own. (See *In re M.D.* (2023) 93 Cal.App.5th 836, 853–854 [father's "failure to take advantage of services offered to him or even to understand why he required them, supported the conclusion he continued to lack insight into the serious concerns that led to dependency"].)

Nor did Mother take responsibility for the home's condition. She attributed the clutter in the home as belonging to other family members and the filthy condition of the kitchen as caused by other household members. As for the bathroom mold, she asked her father to help clean it when he replaced the fan, but neither of them cleaned or removed the mold, allowing it to remain and presumably spread for months until the children were detained. Mother lacks insight as to her responsibility for providing the children with safe and clean shelter.

The court also indicated the lack of ABA therapy for the children and the girls' excessive school absences were concerning; we agree. As the court recognized, these facts alone do not show the children are at risk for serious physical harm or illness. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388–389.) But these facts present concerns as to whether Mother's underlying issues are interfering with her ability to meet the children's developmental and educational needs. Mother testified all three children have been diagnosed with autism and ABA therapy had been recommended for all three. But only A.M. had ABA therapy for any real length of time (D.A. had it for two months more than five years earlier), and he had not had ABA therapy for a year. Mother had discontinued the services of two ABA therapy providers because she was unhappy with their services. While it is understandable Mother wants appropriate care for A.M., it is

16

difficult to determine from this record why A.M., who is on the severe end of the autism spectrum, needed to go a year without the recommended ABA therapy.

While the absence of ABA therapy for the children and L.M. and D.A.'s significant school absences are insufficient on their own to support a jurisdictional finding, they are part of the whole picture viewed by the juvenile court. Part of this picture was evidence indicating Mother had an underlying mental health issue that was interfering with her ability to care for her children and would remain untreated without court intervention. Mother said she did not walk L.M. and D.A. to school because she was afraid to do so. Yet Mother had not obtained treatment and did not believe she needed it. When the totality of the circumstances is examined, there is substantial evidence the children fall under section 300, subdivision (b)(1). (See *In re G.C.* (2020) 48 Cal.App.5th 257, 264–265 [rejecting argument evidence of messy home was insufficient to show danger to child and concluding substantial evidence supported removal order at the disposition hearing].)

Mother relies on *In re J.N.* (2010) 181 Cal.App.4th 1010 (*J.N.*) to support her argument there was no risk of harm to the children because she was committed to maintaining a clean and organized home. But *J.N.* is readily distinguishable from Mother's case. In *J.N.*, the parents and their three children were in a car accident while the father was driving. Both parents were intoxicated at the time. (*Id.* at p. 1015.) There was, however, no evidence of ongoing substance abuse by the parents. Thus, the issue was whether the single incident, which resulted in physical injury to two of the children, was sufficient to support child welfare jurisdiction. (*Id.* at p. 1022.) The appellate court held jurisdiction does not lie under such circumstances; instead, there must be ""'"some reason to believe"'"" there is a "current" or future risk to a child. (*Id.* at p. 1023.) The Court of Appeal explained: "'[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur.'" (*Id.* at p. 1025.) In *J.N.*, the Court of Appeal concluded there was no

17

evidence from which to infer there was a substantial risk the parents' behavior would occur again. (*Id.* at p. 1026.)

Here, however, the endangering conduct was not a single episode. Instead, it took place over a period of months and years. The mold in the bathroom had been present for months at the time the children were removed, and the hazards created by the clutter had been present for at least two years by some accounts. Unlike the situation in *J.N.*, there was evidence Mother's judgment was so deficient she was unable to adequately supervise or protect the children as she permitted them to live in the house in its unsafe and unsanitary condition for a significant period. D.A. had previously been taken to school with an injury to her face that was attributed to furniture falling on her. Even after D.A. sustained this injury, Mother did not remedy the hazardous conditions in her living area. Based on Mother's past conduct, the court could reasonably conclude its oversight was necessary to help prevent a recurrence of the issues that led to the children being removed from Mother's care.

We agree with the juvenile court that Mother is to be commended for quickly mitigating the issues in the house once the children were removed. In reviewing for substantial evidence, we do not substitute our judgment for that of the juvenile court. (*In re Charlisse C.* (2008 ) 45 Cal.4th 145, 159.) If the court's order is supported by substantial evidence, we must affirm. (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087.) Viewing the facts in the light most favorable to the court's decision below, we find substantial evidence supports the court's jurisdictional finding, and therefore, we affirm.

18

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.